IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JAMES MICHAEL WILLIAMS, #148238, )
                                              )
         Plaintiff,              )
                                                )
v.                                )    CIVIL ACTION NO. 2:09-CV-375-TMH
                                                )                 [WO]
                                                )
CONNIE BEDSOLE,             )
                                                )
         Defendant.             )

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I.  INTRODUCTION**

This case is before the court on a 42 U.S.C. § 1983 complaint filed by James Michael Williams ["Williams"], an indigent state inmate, on April 15, 2009.[1]  In this complaint, Williams alleges Connie Bedsole, a drug program specialist at Ventress Correctional Facility, discriminated against him due to his superior intellect and heightened vocabulary.  In support of this claim, Williams maintains that Bedsole issued false citations against him in October of 2006 and January of 2007 for altering state

---

[1] Although the Clerk of this court stamped the complaint "received" on April 23, 2009, it is clear that Williams presented the complaint to prison officials for mailing prior to this date.  A review of the pleadings indicates Williams executed the complaint on April 15, 2009.  *Complaint - Doc. No. 1* at 4. Thus, this date is the earliest date on which Williams could have presented the complaint to prison officials for mailing.  The law is well settled that a *pro se* inmate's complaint is deemed filed the date it is delivered to prison officials for mailing.  *Houston v. Lack*, 487 U.S. 266, 271-272 (1988); *Adams v. United States*, 173 F.3d 1339, 1340-41 (11th Cir. 1999); *Garvey v. Vaughn*, 993 F.2d 776, 780 (11th Cir. 1993).  "Absent evidence to the contrary in the form of prison logs or other records, [this court] must assume that [the instant complaint] was delivered to prison authorities the day [Williams] signed it...."  *Washington v. United States*, 243 F.3d 1299, 1301 (11th Cir. 2001).  For purposes of this Recommendation, the court considers April 15, 2009 as the date of filing.

property and disruptive behavior, causing his dismissal from the Crime Bill Program. Williams also asserts that Bedsole subsequently cited him for unauthorized sleeping and disruptive behavior in violation of his constitutional rights. Finally, Williams alleges that Bedsole violated his right to the free exercise of his religion by requiring him to stand and face the flag during the Pledge of Allegiance.[2] Williams seeks monetary damages and injunctive relief.[3]

The defendant filed special reports and supporting evidentiary materials addressing the claims presented in the complaint. Pursuant to the orders entered in this case, the court deems it appropriate to construe these reports as a motion for summary judgment. *Order of June 24, 2009 - Doc. No. 14*; *Order of September 28, 2009 - Doc. No. 24*. Thus, this case is now pending on the defendant's motion for summary judgment. Upon consideration of this motion, the evidentiary materials filed in support thereof and the plaintiff's responses, the court concludes that the defendant's motion for summary judgment is due to be granted.

## II.  STANDARD OF REVIEW

---

[2] Williams states that he believes in God and that Jesus is the Son of God but does not identify his religion.

[3] Williams completed the Crime Bill Program in November of 2007 and is not eligible for further participation in this program. Thus, his claims for injunctive relief are moot. *See McKinnon v. Talladega County, Ala.,* 745 F.2d 1360, 1363 (1984); *Zatler v. Wainwright,* 802 F.2d 397, 399 (11th Cir.1986) (per curiam); *Adler v. Duval County School Board*, 112 F.3d 1475, 1477 (11th Cir. 1997) (injunctive relief is "a prospective remedy, intended to prevent future injuries" to the plaintiff); *See, e.g., Wahl v. McIver,* 773 F.2d 1169, 1173 (11th Cir.1985) (*per curiam*) (prisoner's past exposure to sub-par conditions "does not constitute a present case or controversy involving injunctive relief").

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed.R.Civ.P. Rule 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[4]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [-- now dispute --] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-324.

The defendant has met her evidentiary burden and demonstrated the absence of any

---

[4]Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions." Fed.R.Civ.P. 56 Advisory Committee Notes.  Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination." *Id*.  "'Shall' is also restored to express the direction to grant summary judgment."  *Id*.  Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing the prior versions of the rule remain equally applicable to the current rule.

genuine dispute of material fact.  Thus, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may ... grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it.")  A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.  *Greenberg*, 498 F.3d at 1263.  Consequently, to survive the defendant's properly supported motion for summary judgment, Williams is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims for relief.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Rule 56(e), *Federal Rules of Civil Procedure*.  "If the evidence [on which the nonmoving party relies] is merely colorable ... or is not significantly probative ... summary judgment may be granted."  *Id*. at 249-250.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)."  *Walker v. Darby*, 911 F.2d 1573, 1576-1577

(11th Cir. 1990). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001); *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (plaintiff's "conclusory assertions ..., in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment...."). Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate.).

For summary judgment purposes, only disputes involving material facts are relevant.

*United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami,*

*Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the

substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Secretary of*

*the Department of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only

factual disputes that are material under the substantive law governing the case will

preclude entry of summary judgment."). "The mere existence of some factual dispute will

not defeat summary judgment unless that factual dispute is material to an issue affecting

the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243

(11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the

party opposing summary judgment "must do more than simply show that there is some

metaphysical doubt as to the material facts.... Where the record taken as a whole could not

lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute]

for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In cases where the evidence before the court which is admissible on its face or which can

be reduced to admissible form indicates there is no genuine dispute of material fact and

establishes the party moving for summary judgment is entitled to it as a matter of law,

summary judgment is proper. *Celotex*, 477 U.S. at 323-324 (Summary judgment is

appropriate where pleadings, evidentiary materials and affidavits before the court show

there is no genuine dispute as to a requisite material fact.); *Waddell*, 276 F.3d at 1279 (To

6

establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor.).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard*, 548 U.S. at 525, 126 S.Ct. at 2576; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case.

### III.  DISCUSSION

### A.  Absolute Immunity

To the extent that Williams seeks relief from the defendant in her official capacity, the defendant is entitled to absolute immunity from monetary damages. Official capacity lawsuits are "in all respects other than name, ... treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985). "A state official may not be sued in his [or her] official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996).

Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity.  Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing, it is clear that the defendant is a state actor entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from her in her official capacity. *Lancaster*, 116 F.3d at 1429; *Jackson v. Georgia Department of Transportation*, 16 F.3d 1573, 1575 (11th Cir. 1994); *Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1989).

### B.  Claims for Relief[5]

Correctional officials placed Williams in the Crime Bill Program at Ventress on October 25, 2006.[6] Williams was assigned to Ms. Bedsole's caseload, and she was responsible for supervising and counseling Williams during his time as a participant in the program.  Williams completed Phase I of the program on January 2, 2007. Williams maintained his place in the Crime Bill Program until January 9, 2007, when the defendant

---

[5] Although Williams references actions with respect to the serenity prayer in his responses to the defendant's reports, he did not present this claim in his complaint nor did he file an amendment to the complaint raising this issue. This Recommendation addresses only those claims properly presented to the court by Williams in his complaint.

[6] "The Crime Bill Program incorporates counseling for substance abuse, anger management, and criminal thinking for a period of six months." *Defendant's Special Report - Doc. No. 13* at 2, n.3.

removed him from the program due to his negative behavior.  Williams re-entered the Crime Bill Program at Phase II on July 13, 2007 and graduated from the program on November 9, 2007.

      **1.**   **Intellectual/Speech Discrimination**.  During a group session prior to his removal from the program in January of 2007, Williams expressed himself "as [he] normally would." *Complaint - Doc. No. 1* at 3.  Other inmates in the group did not understand Williams, and Bedsole therefore requested that he "use words on their level." *Id.*  It is clear that Bedsole did not prevent Williams from speaking, but merely suggested he do so in a manner which could be understood by all inmates participating in the group session.  Williams complains that Bedsole, in retaliation for/discrimination against  his seeking to use his superior intellect and vocabulary, issued him write-ups for disturbing/disrupting behavior – i.e., being loud and argumentative with another inmate, and altering state property.[7]

      The defendant asserts that any claims regarding actions which occurred over two years prior to the filing of this case are barred by the statute of limitations governing a 42 U.S.C. § 1983 action filed in this court.

> All constitutional claims brought under § 1983 are tort actions, subject to the statute of limitations governing personal injury actions in the state where the § 1983 action has been brought.  *Wilson v. Garcia*, 471 U.S. 261, 275-76,

---

[7]Bedsole issued the challenged write-ups on October 26, 2006, and January 9, 2007, the latter of which resulted in removal of Williams from the Crime Bill Program.

> 105 S.Ct. 1938, 1946-47, 85 L.Ed.2d 254 (1985). [The plaintiff's] claim was brought in Alabama where the governing limitations period is two years. Ala. Code § 6-2-38; *Jones v. Preuit & Mauldin*, 876 F.2d 1480, 1483 (11th Cir. 1989) (en banc). Therefore, in order to have his claim heard, [the plaintiff is] required to bring it within two years from the date the limitations period began to run.

*McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008).

Williams presents claims arising from actions taken against him by the defendant in October of 2006 and January of 2007. It is clear from the documents filed by Williams that the tolling provision of *Ala. Code* § 6-2-8(a) provides no basis for relief from application of the time bar.[8] To the extent Williams maintains that his claims are not time barred, as he filed the complaint at the time he discovered the injury – that is, denial of parole by the Alabama Board of Pardons and Parole based on these citations, *Plaintiff's Response - Doc. No. 17* at 6 – this assertion fails to toll the limitation period as it is clear Williams knew of the citations and the facts underlying the alleged constitutional violations related thereto at the time each citation was issued against him. It is at the time of issuance of the respective citation that any relative cause of action accrued against Ms. Bedsole. Consequently, with respect to the intellectual/speech discrimination claims, the limitation period began to run, at the latest, on January 10, 2007.[9] The limitation period ran without

---

[8] The relevant portion of this section permits tolling of the limitation period for an individual who "is, at the time the right accrues ... [legally] insane...." *Ala. Code* § 6-2-8(a).

[9] In computing the federal period of limitation, "exclude the day of the event[s] that triggers the period[.]" Rule 6(a)(1)(A), *Federal Rules of Civil Procedure*.

interruption until its expiration on January 12, 2009.[10]  Williams filed the instant complaint on April 15, 2009.  This filing occurred **after** the applicable period of limitation expired on his claims of intellectual/speech discrimination.

### 2.  Challenges to Reports for Sleeping in An Unauthorized Area, Sleeping at An Unauthorized Time and Disturbing/Disruptive Behavior (Calling Another Inmate Retarded).[11]

A.  Equal Protection.  Williams maintains that Bedsole violated his right to equal protection by initiating/ordering write-ups against him for unauthorized sleeping and disruptive behavior due to his religious beliefs.  Specifically, Williams asserts that these actions arose from the parties' divergent beliefs "in regard to who was Jesus; God Himself, Son of God or Prophet....  She felt Jesus was God himself.  I felt the latter two options above:  Prophet and Son of God."  *Complaint - Doc. No. 1* at 3.

In order to establish a claim cognizable under the Equal Protection Clause, "a prisoner must [at a minimum] demonstrate that (1) he is situated similarly to other prisoners who received more favorable treatment; and (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other

---

[10] Since expiration of the two-year period of limitation fell on January 10, 2009, a Saturday, the limitation period  expired the following Monday.  Rule 6(a)(1)(C), *Federal Rules of Civil Procedure* ("[I]f the last day [of the period] is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday.").

[11] These reports were issued on September 4, 2007, September 28, 2007, and October 29, 2007, respectively, and therefore occurred within the two-year period of limitation.

constitutionally protected basis.  *Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir. 2001);

*Damiano v. Florida Parole and Prob. Comm'n*, 785 F.2d 929, 932-33 (11th Cir. 1986)."

*Sweet v. Secretary, Department of Corrections*, 467 F.3d 1311, 1318-1319 (11th Cir. 2006).

"[O]fficial action will not be held unconstitutional solely because it results in a ...

disproportionate impact....  Proof of ... discriminatory intent or purpose is required to show

a violation of the Equal Protection Clause."  *Village of Arlington Heights v. Metropolitan*

*Housing Development Corp.*, 429 U.S. 252, 264-265 (1977).  "'Discriminatory purpose'

... implies more than intent as volition or intent as awareness of consequences.  It implies

that the decision maker ... selected ... a particular course of action at least in part 'because

of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  *Personnel*

*Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (footnote and citation

omitted); *see also Hernandez v. New York*, 500 U.S. 352, 359 (1991).  Evidence which

merely indicates disparity of treatment or even arbitrary administration of state powers,

rather than instances of purposeful or invidious discrimination, is insufficient to show

discriminatory intent.  *McKleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d

262 (1987).

Since this case is before the court on a properly supported motion for summary

judgment from the defendant, Williams bears the burden of producing evidence which

would be admissible at trial sufficient to show that the actions of defendant Bedsole

resulted from intentional discrimination.  *Celotex*, 477 U.S. at 322-324; *Waddell*, 276 F.3d at 1279.  The plaintiff cannot rest on conclusory allegations of a constitutional violation to defeat summary judgment nor is "[t]he mere existence of a scintilla of evidence in support of [his] position" sufficient to avoid summary judgment.  *Anderson*, 477 U.S. at 252; *Waddell*, 276 F.3d at 1279 (conclusory allegations based solely on subjective beliefs are insufficient to oppose summary judgment).  Instead, the law is clear that the plaintiff must present significant probative evidence of intentional discrimination to preclude summary judgment in favor of the defendant.  *Anderson*, 477 U.S. at 249.

The defendant adamantly denies she undertook any adverse action against Williams based on his religious beliefs.  *Defendant's Exhibit A to the June 24, 2009 Special Report - Doc. No. 13-1* at 1-4.  Defendant Bedsole further maintains that the citations issued against Williams occurred solely due to the inmate's improper behavior.  *Id*. at 3.  The rule violation reports contained in Williams' prison file support this assertion.

Williams fails to identify any similarly situated inmate who received more favorable treatment.  Thus, his "equal protection claim necessarily fails first because he has not shown that he was treated differently from other, similarly situated prisoners."  *Sweet*, 467 F.3d at 1319.  In addition, Williams fails to present significantly probative evidence that his religious beliefs constituted a motivating factor in the issuance of the write-ups for disruptive behavior and unauthorized sleeping.  The defendant states that correctional

13

officials issued the challenged write-ups only because Williams violated applicable rules. Other than Williams' self-serving, conclusory allegation that the defendant violated his equal protection rights, the record is devoid of evidence that the defendant acted in an intentionally discriminatory manner. Thus, the defendant is entitled to summary judgment on this claim.

B. <u>Retaliation</u>. Williams maintains that the behavior citations occurred in retaliation for his expressing his religious beliefs in violation of his First Amendment rights. Defendant Bedsole, however, contends that Williams received the citations at issue because his behavior violated various institutional rules. *Defendant's Exhibit A to the June 24, 2009 Special Report - Doc. No. 13-1* at 3. The affidavits of additional correctional officials and other evidentiary materials submitted by the defendant as exhibits to her special reports support this assertion.

It is essential that federal courts "carefully scrutinize retaliation claims" brought by prisoners challenging adverse actions of correctional personnel. *Woods*, 60 F.3d at 1166. "[C]ourts must approach prisoner claims of retaliation with skepticism and particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2nd Cir. 1983). This is [necessary because prisoners'] ... claims of retaliation are ... easily fabricated [and] pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official--even

those otherwise not rising to the level of a constitutional violation--can be characterized [by the prisoner] as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d 489, 491 (2nd Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Federal law likewise recognizes "that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' [*Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807 (1974)]. As the *Martinez* Court acknowledged, 'the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree.' *Id.*, at 404-405, 94 S.Ct., at 1807. Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources...." *Turner v. Safley*, 482 U.S. 78, 84-85, 107 S.Ct. 2254, 2259 (1987). Correctional officials are therefore "accorded latitude in the administration of prison affairs[,]" *Cruz v. Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081 (1972), which necessarily includes "the [inescapable] withdrawal or limitation of many [inmate] privileges and rights." *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974) (quotation marks and citation omitted); *Bell v. Wolfish,* 441 U.S. 520, 546, 99 S.Ct. 1861, 1877 (1979).

"In the First Amendment context, ... some rights are simply inconsistent with the status of a prisoner or 'with the legitimate penological objectives of the corrections system.'" *Shaw v. Murphy*, 532 U.S. 223, 229, 121 S.Ct. 1475, 1479 (2001), quoting *Pell*,

417 U.S. at 822, 94 S.Ct. at 2804.  In accordance with this principle, an inmate's rights established under the First Amendment are not protected if allowing such protection is "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  *Pell*, 417 U.S. at 822, 924 S.Ct. at 2804.  Thus, while inmates retain a constitutional right protected by the First Amendment to freely express their opinions/beliefs, this right is limited by the fact of incarceration and valid penological objectives such as maintaining institutional security and order.  The law is well settled that "central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves."  *Pell*, 417 U.S. at 823, 94 S.Ct. at 2804; *Bell v. Wolfish,* 441 U.S. at 546, 99 S.Ct. at 1878 ("[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees.").  It is therefore clear that preservation of security and order within a correctional facility is essential to the facility's effective administration and constitutes both a compelling and substantial governmental interest.  *Pell*, 417 U.S. at 823, 94 S.Ct. at 2804; *Lawson v. Singletary*, 85 F.3d 502, 512 (11th Cir. 1996); *Harris v. Chapman*, 97 F.3d 499, 504 (11th Cir. 1996).

"The first amendment prohibits state officials from retaliating against prisoners for exercising their right of free [expresion].  *See, e.g., Wright v. Newsome*, [795 F.2d 964, 968

(11th Cir. 1986)]....   The gist of a retaliation claim is that a prisoner is penalized for exercising a [protected] right...." *Thomas v. Evans*, 880 F.2d 1235, 1241-1242 (11th Cir. 1989); *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003).  "In prison, of course, first amendment rights are not absolute.  *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).  Legitimate policies and goals of the correction system may justify restrictions limiting prisoners' [First Amendment] rights.  417 U.S. at 821."  *Adams v. James*, 784 F.2d 1077, 1081 (11th Cir. 1986).  "A prisoner retains those First Amendment rights that are 'not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrective system.'  *Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir. 2001) (quoting *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 129, 97 S.Ct. 2532, 53 L.Ed.2d 629 (resist)) (internal quotation marks omitted)....  [P]rison authorities have a legitimate penological interest in the consistent enforcement of prison rules and ... disciplining prisoners who attempt to coerce a guard into not enforcing prison rules is reasonably related to that interest."  *Hargis v. Foster*, 312 F.3d 404, 409-410 (9th Cir. 2002); *see also Jackson v. Cain*, 864 F.2d 1235, 1248 (5th Cir. 1989).  The situation is somewhat complicated when the alleged act of retaliation is undertaken to assure compliance with prison rules, as inmates often attempt to "inappropriately insulate themselves from [such] actions by drawing the shield of retaliation around them."  *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995), *cert. denied*

17

*sub nom Palermo v. Woods*, 516 U.S. 1084, 116 S.Ct. 800, 133 L.Ed.2d 747 (1996).

To proceed on a claim for retaliation and withstand the entry of summary judgment, an "inmate must establish ... three elements: (1) his [expression] was constitutionally protected; (2) the inmate suffered adverse action such that the [defendant's] allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such [action]; and (3) there is a causal relationship between the retaliatory action and the protected [act]. *See Bennett v. Hendrix*, 423 F.3d 1247, 1250, 1254 (11th Cir. 2005)." *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008); *Thaddeus-X v. Blatter*, 175 F.3d 378, 397 (6th Cir. 1999). With respect to the causal relationship element, a prisoner must demonstrate that correctional officials intended to retaliate for his exercise of a right protected under the First Amendment and, but for the retaliatory motive, the adverse act complained of would not have occurred. *Woods*, 60 F.3d at 1166; *Smith*, 532 F.3d at 1278.

Williams alleges that defendant retaliated against him for expressing his religious beliefs, thus satisfying the first element of his retaliation claim. *Smith*, 532 F.3d at 1277. The second element requires Williams to demonstrate that his citations "would likely deter a [prisoner] of ordinary firmness" from expressing his religious beliefs. *Id*. This "presents an objective standard and a factual inquiry." *Id*. The court assumes *arguendo* that this standard has been met. Nevertheless, Williams fails to satisfy the third element of a retaliation claim – a causal connection between his constitutionally protected activity and

18

the adverse action of the defendant.

The causal connection inquiry focuses on the "subjective motivation of the defendant[,]" *Thaddeus-X*, 175 F.3d at 399, and this court must therefore determine "whether the defendant[] [was] subjectively motivated to discipline" Williams for expressing his religious beliefs. *Smith*, 532 F.3d at 1278. The subjective motivation issue is resolved by most courts under the burden-shifting formula set forth in *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977). This formula requires that the plaintiff first meet "his burden of establishing that his protected conduct was a motivating factor behind any harm" and then "the burden of production shifts to the defendant. If the defendant can show that [she] would have taken the same action in the absence of the protected activity, [she] is entitled to prevail on summary judgment." *Thaddeus-X*, 175 F.3d at 399 (referencing the *Mt. Healthy* motive analysis); *Smith*, 532 F.3d at 1278 n.22 ("Under the *Mt. Healthy* approach, if the government official 'can prove that [she] would have taken the adverse action in the absence of the plaintiff's protected conduct, [she] cannot be held liable.' *Thaddeus-X*, 175 F.3d at 388 n.4....").

The defendant denies the allegation of retaliation and asserts that the behavior citations about which Williams complains occurred in an effort to maintain security by requiring Williams' to conform to applicable rules governing inmate behavior, not because he expressed his religious beliefs. Williams offers only his conclusory allegation of

ultimate fact that the defendant retaliated against him for expressing himself. This allegation is insufficient to defeat summary judgment. *Waddell*, 276 F.3d at 1279; *Holifield*, 115 F.3d at 1564, n.6. Moreover, even assuming that a reasonable fact finder could infer the motivating factor element, it is clear under *Mt. Healthy* that the defendant would have disciplined Williams for his behavior regardless of his beliefs as the conduct made the basis of the challenged write-ups violated institutional rules. *Turner*, 482 U.S. 91-92, 102 S.Ct. at 2262-2263. "Objective prison administrators standing in [the defendant's] shoes would assume that [allowing a violation of institutional rules] ... would be noised about the prison's population and, if ignored, could seriously impede their ability to maintain order and thus achieve the institution's penological objectives." *Smith*, 532 F.3d at 1279. Consequently, the defendant is entitled to summary judgment on the First Amendment retaliation claim. *Id*. at 1278-1279.

C. <u>False Write-Ups</u>. To the extent that the complaint can be construed to contain a claim that Bedsole or those acting at her direction lodged false behavior write-ups against Williams, this claim likewise entitles Williams to no relief. Bedsole asserts that the challenged write-ups occurred solely due to Williams' violation of general institutional rules governing inmate behavior and additional rules applicable to inmates participating in the Crime Bill Program. *Defendant's Exhibit A to the June 24, 2009 Special Report - Doc. No. 13-1* at 2-3. It is therefore clear that the defendant does not admit that the

information contained in the institutional write-ups is either fabricated or false.

In *Monroe v. Thigpen*, 932 F.2d 1437 (11th Cir. 1991), the Court held that reliance on ***admittedly false information*** to deny a prisoner consideration for parole was arbitrary and capricious treatment violative of the Constitution. The appellate court carefully distinguished its holding from its prior decision in *Slocum v. Georgia State Bd. of Pardons and Paroles*, 678 F.2d 940 (11th Cir.), *cert. denied*, 459 U.S. 1043 (1982).

> Our holding today does not conflict with our earlier holding in *Slocum*, *supra*. In *Slocum*, the plaintiff, who had been denied parole, made the conclusory allegation that the Board must have relied upon erroneous information because otherwise the Board would surely have granted him parole. *Slocum*, 678 F.2d at 941. The plaintiff then sought to assert a due process right to examine his prison file for the alleged errors. Unlike the instant case, in *Slocum* the state did not admit that it had relied upon false information in denying parole nor did the plaintiff present any evidence that his prison file even contained any false information. We held in *Slocum* that prisoners do not state a due process claim by merely asserting that erroneous information may have been used during their parole consideration. *Id.* at 942. We also determined that prisoners do not have a due process right to examine their prison files as part of a general fishing expedition in search of false information that could possibly exist in their files. *Id*. In the case at bar, we are confronted with prison authorities who admit that information contained in Monroe's files is false and that they relied upon such information, at least in part, to deny Monroe parole and to classify him as a sex offender. As we stated, the parole statute does not authorize state officials to rely on knowingly false information in their determinations. *Thomas [v. Sellers]*, 691 F.2d [487] at 489 [(11th Cir. 1982)].

*Monroe*, 932 F.3d at 1442.

*Slocum* controls the disposition of the instant case. The defendant asserts that the information relied upon in initiating the citation process is correct and an accurate representation of the plaintiff's disruptive conduct.  Moreover, there is no evidence before the court that the defendant relied on information she knew to be false when citing Williams for his non-conforming behavior.  Specifically, there is no admission by the defendant that the information utilized in levying the write-ups against Williams is false, incorrect or erroneous.  The record in this case therefore establishes that the defendant did not rely on ***admittedly*** false information.  In light of the foregoing, the plaintiff is entitled to no relief as a matter of law and summary judgment is due to be granted in favor of the defendant on his false/fabricated citations claim.

**3.  <u>Free Exercise of Religion</u>**.  As previously noted, Williams does not identify his religious affiliation.  *Infra* at 2, n.2.  Williams alleges that throughout his participation in the Crime Bill Program Bedsole forced him to stand and face the flag during the Pledge of Allegiance in violation of his religious beliefs as he "only pledge[s] to God."  *Complaint - Doc. No. 1* at 3; *Plaintiff's Response (Affidavit of James Michael Williams) - Doc. No. 17* at 12 (In a conversation with Bedsole as to "why I was not saying the pledge of allegiance to the flag[,] I told her it was against my spiritual beliefs in being that I only pledge to God. She stated, after long debate, again trying to show me that my spiritual perspective and religious beliefs were wrong, that I do not have to 'say' the pledge of allegiance but I had

22

to 'stand' and could not look away from the flag...."). Bedsole denies these allegations.

*Defendants' Supplemental Special Report (Supplemental Affidavit of Connie Bedsole) - Doc. No. 23-1* at 1-2 ("I have never told [any inmate participating in the Crime Bill Program] they have to say the pledge or look in the direction of the flag. Residents in the Crime Bill Program are asked to stand in unison to display unity with the Crime Bill Family, not in reverence to the flag.... I have never threatened Inmate Williams that he would receive a staff write-up if he did not stand [during the pledge]. If an inmate notifies me that he has a problem with the pledge, he is told that he is not required to say the pledge or to look in the direction of the flag. Inmates are then asked if they have a problem standing with the Crime Bill Family as a sign of unity. If an inmate tells the staff they do, then they are not required to stand. Inmate Williams never told me, or to my knowledge told any staff person that he had a problem standing with his Crime Bill Family."). Bedsole also argues that she is entitled to qualified immunity.

> "The doctrine of qualified immunity provides that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Case v. Eslinger*, 555 F.3d 1317, 1325 (11th Cir. 2009) (internal quotation marks omitted). "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. [223], 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009). "[Q]ualified immunity is a privilege that provides 'an ***immunity from suit*** rather than a mere defense to liability.'" *Bates v.*

23

*Harvey*, 518 F.3d 1233, 1242 (11th Cir. 2008) (quoting *Saucier v. Katz*, 533 U.S. 194, 200-01, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001))....

>    "To invoke qualified immunity, the official first must establish that he was acting within the scope of [her] discretionary authority" when the alleged violation occurred. *Id.* at 1325. "If, interpreting the evidence in the light most favorable to the plaintiff, the court concludes that the defendant was engaged in a discretionary function, then the burden shifts to the plaintiff to show that the defendant is ***not*** entitled to qualified immunity." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). "[T]he plaintiff must ... show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Id.* "The judges of the district courts and the courts of appeals [are] permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S.Ct. at 818.

*Townsend v. Jefferson County*, 601 F.3d 1152, 1157-1158 (11th Cir. 2010) (emphasis in original); *Coley v. Smith*, 441 Fed.Appx. 627, 629 (11th Cir. 2011) ("To overcome Defendants' qualified-immunity defense, Plaintiff bears the burden of showing both that Defendants' conduct amounted to a constitutional violation and that the right violated was already 'clearly established' at the time of Defendants' conduct. *Youmans v. Gagnon,* 626 F.3d 557, 562 (11th Cir.2010). Failure to make either showing will defeat Plaintiff's claim."). "The essence of qualified immunity analysis is the public official's objective reasonableness, regardless of [her] underlying intent or motivation." *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004).

>    The purpose of the qualified immunity defense is to "protect[] government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 555 U.S.

223, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). The defense "ensure[s] that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 2158, 150 L.Ed.2d 272 (2001). "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." *Lassiter v. Ala. A&M Univ., Bd. of Trs.,* 28 F.3d 1146, 1149 (11th Cir.1994) (en banc)

*Youmans v. Gagnon*, 626 F.3d at 562; *Kingsland*, 382 F.3d at 1231 ("Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'").

The record before the court establishes that the defendant was acting within the scope of her discretionary authority when the alleged wrongful acts occurred. Thus, "the burden shifts to the plaintiff to show that the grant of qualified immunity is inappropriate." *Oliver v. Fiorino*, 586 F3d. 898, 905 (11th Cir. 2009) (internal citation and quotations omitted). This court "must grant qualified immunity to the government official unless the plaintiff can show 'that the facts when viewed in the light most favorable to the plaintiff establish a constitutional violation' and 'that the illegality of the [government official's] actions was "clearly established" at the time of the incident.'" *Muhammad v. Sapp*, 388 Fed.Appx. 892, 897-898 (11th Cir. 2010). In accordance with well established law, this court "may exercise [its] sound discretion to decide which prong of the inquiry to address

first.  *Pearson*, 129 S.Ct. at 818."  *Oliver*, 586 F.3d at 905; *Muhammad*, 388 Fed.Appx. at

897 (same).

Williams contends that the defendant violated the Free Exercise Clause of the First

Amendment by requiring that he stand and face the flag during the Pledge of Allegiance.

In this case, the court deems it appropriate to proceed to the second prong of the qualified

immunity analysis by addressing whether the defendant violated a clearly established

constitutional right.

> A "clearly established" right is one whose contours are fixed "so
> clearly that a reasonable official would have understood his acts were
> unlawful." *Dolihite v. Maughon,* 74 F.3d 1027, 1040-41 (11th Cir. 1996). A
> judicial precedent is not always required to establish clearly a right: in some
> situations, "the words of a ... federal constitutional provision may be so clear
> and the conduct so bad that case law is not needed to establish that the
> conduct cannot be lawful." *Vinyard v. Wilson,* 311 F.3d 1340, 1350 (11th
> Cir. 2002).

*Coley*, 441 Fed.Appx at 629.  The First Amendment's Free  Exercise Clause does not

clearly prohibit requiring an inmate to stand and face the flag during the Pledge of

Allegiance.  The court therefore concludes that this is not a case where the Constitution

itself is "so clear or the conduct so bad that case law is not needed...."  *Vinyard*, 311 F.3d

at 1350.

The court therefore turns to the question of whether Williams' right was clearly

established by a legal precedent in existence at the time the defendant acted.  The Supreme

Court has declared that this inquiry "'must be undertaken in light of the specific context

of the case, not as a broad general proposition.'" *Brosseau v. Haugen,* 543 U.S. 194, 198,

125 S.Ct. 596, 599 (2004) (per curiam) (quoting *Saucier v. Katz,* 533 U.S. 194, 201, 121

S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001)).

> "In order to determine whether a right is clearly established, we look
> to the precedent of the Supreme Court of the United States, [the] precedent
> [of the Eleventh Circuit Court of Appeals], and the pertinent state's supreme
> court precedent, interpreting and applying the law in similar circumstances."
> [*Oliver*], 586 F.3d at 907. If there is no precedent on point, a right is clearly
> established only if the law has "earlier been developed in such [a] concrete
> and factually defined context to make it obvious to all reasonable
> government actors, in the defendant's place, that what he is doing violates
> federal law." *Crawford v. Carroll,* 529 F.3d 961, 977-78 (11th Cir. 2008)
> (quotation marks omitted). "Qualified immunity affords protection to all but
> the plainly incompetent or those who knowingly violate the law." *Id.* at 978
> (quotation marks omitted). "We have noted that '[i]f the law does not put the
> [official] on notice that his conduct would be clearly unlawful, summary
> judgment based on qualified immunity is appropriate.'" *See Vinyard v.
> Wilson,* 311 F.3d 1340, 1350 (11th Cir. 2002) (quoting *Saucier v. Katz,* 533
> U.S. 194, 202, 121 S.Ct. 2151, 2156-57, 150 L.Ed.2d 272 (2001)).

*Muhammad*, 388 Fed.Appx. at 898; *Jenkins by Hall v. Talladega City Bd. of Education*,

115 F.3d 821, 826 n. 4 (11th Cir.1997) (en banc) (When determining "clearly established"

law, this court looks only to "decisions of the U.S. Supreme Court, Eleventh Circuit Court

of Appeals, or the highest court of the state where the case arose.")

Williams has not identified, nor has this court found any decision of the United

States Supreme Court, the Eleventh Circuit Court of Appeals or the Alabama Supreme

Court addressing the constitutionality of requiring an inmate to stand and face the flag

during the Pledge of Allegiance.   The search conducted by this court did not locate any

decision by the aforementioned courts which discussed facts or determined issues arising in a prison setting with respect to the Pledge.  Thus, the right on which Williams bases his claim – that of an inmate to sit and turn away from the flag during the Pledge of Allegiance – was not clearly established during the pertinent time period.[12]   Consequently, the defendant is entitled to qualified immunity on this claim.[13]

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The defendant's motion for summary judgment be GRANTED.

2.  Judgment be GRANTED in favor of the defendant.

3.  This case be dismissed with prejudice.

4.  No costs be taxed herein.

It is further

---

[12] Although it is well established that children in public schools cannot be compelled by school officials to salute the flag or say the Pledge of Allegiance, *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187 (1943), this court found no case extending these rights to inmates.  Moreover, since  the claims of students and those of inmates are distinguishable in both fact and circumstance, and as the claims of these two distinct groups are subjected to differing standards of scrutiny, this court does not consider *Barnette* to set forth clearly established law regarding an inmate's rights.

[13] The court notes that Williams' request for monetary damages from Bedsole in her individual capacity, the only relief currently available to him, would also entitle him to no relief even if pursued under the Religious Land Use and Institutionalized Persons Act of 2000 ["RLUIPA"] as RLUIPA does not create "a private action against individual defendants for monetary damages."  *Smith v. Allen*, 502 F.3d 1255, 1275 (11th Cir. 2007) (abrogated on other grounds by *Sossamon v. Texas*, — U.S. —, 131 S.Ct. 1651).  In *Sossamon*, the Supreme Court abrogated *Smith's* denial of sovereign immunity to the State of Texas and held, in pertinent part, "that States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA...." 131 S.Ct. at 1663.  Thus, with respect to any RLUIPA claims, there is no cause of action against Bedsole for monetary damages in her individual capacity and sovereign immunity would likewise protect her from monetary damages sought against her in her official capacity.

ORDERED that on or before September 20, 2012, the parties may file objections to this Recommendation.  Any objections filed must clearly identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Securities, Inc*., 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE, this 6th day of September, 2012.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE